923 So.2d 375 (2005)
Ernest WHITFIELD, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-651.
Supreme Court of Florida.
November 3, 2005.
Rehearing Denied February 17, 2006.
*377 John W. Jennings, Capital Collateral Regional Counsel  Middle Region and Peter J. Cannon, Assistant Capital Collateral Counsel  Middle Region, Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Katherine V. Blanco, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
Ernest Whitfield was convicted of first-degree murder and sentenced to death. We affirmed his conviction. See Whitfield v. State, 706 So.2d 1, 2-3 (Fla.1997). He now appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the circuit court's order denying the motion on all issues.

I. FACTS
In early June 1995, Whitfield visited the home of Clarentha Reynolds to seek money from Reynolds, Willie Mae Brooks, and Estella Pierre.[1] Pierre and Whitfield had previously dated. When they refused, Whitfield attempted to take Pierre's purse. Reynolds, however, grabbed him in a headlock and forcibly ejected him. Before leaving, Whitfield threatened, "I'm going to kill all three of you bitches."
Whitfield again visited the home in the predawn hours of June 19, weeks after making the threat. He asked Brooks to let him enter but she refused and returned to bed. A short time later Whitfield forcibly entered the home, armed himself with an eight-inch kitchen knife, and proceeded to the room where Brooks slept beside her infant son. Whitfield raped Brooks and threatened to kill her and her son if she screamed. He then proceeded to Reynolds's room, where she slept with her five children. About ten minutes later, Reynolds, bloodied and near death, stumbled into Brooks's room. A medical examiner would later testify that she had been stabbed twenty-one times, many of the wounds penetrating her flesh up to seven inches. She told Brooks that Whitfield had stabbed her. Brooks and Reynolds's twelve-year-old son escaped through a window and ran for help. Whitfield fled. Shortly after the police arrived, Reynolds died.
Whitfield was apprehended later that day. He admitted the stabbing and led police to the murder weapon. He also told them that he had been high on crack cocaine at the time of the crime.
At trial, Whitfield presented a defense of voluntary intoxication by crack cocaine. His expert witness, a clinical psychologist named Dr. Regnier, testified that Whitfield exhibited classic symptoms of cocaine abuse and opined that there was reasonable doubt of premeditation. The State's expert testified in rebuttal that Whitfield had the capacity to form specific intent at the time of the crime, and cited the fact that Whitfield was arrested within two hours of the murder and did not appear intoxicated. The expert also opined that the manner in which the crime was committed showed planning ability.
The jury convicted Whitfield of armed burglary, sexual battery with a deadly weapon, and first-degree murder. At the penalty phase, Whitfield presented evidence through Dr. Regnier of his impoverished background and deprived childhood as well as his severe drug dependence and *378 his intoxication at the time of the crime. The State presented evidence of Whitfield's prior violent crimes. The jury recommended the death penalty. The trial judge followed the recommendation, finding three aggravators: "prior violent felonies (two prior aggravated batteries and contemporaneous sexual battery of another victim in this case); commission in the course of a burglary; and that the murder was heinous, atrocious, or cruel." Whitfield, 706 So.2d at 3.
On appeal of the conviction and sentence, Whitfield raised five issues.[2] This Court found no merit to any of them and affirmed his convictions.
In May 2002, Whitfield filed his amended 3.850 motion, raising twenty-one claims. In a thorough sixty-page order, the circuit court denied relief on all of them. Whitfield now raises six issues: (1) ineffective assistance of counsel in the guilt phase for failing to adequately investigate and present a voluntary intoxication defense to the offenses of first-degree murder, burglary, and armed sexual battery and for failing to hire a defense expert in the field of toxicology; (2) ineffective assistance of counsel at the guilt phase for failing to adequately investigate, prepare, and present the defense case as a result of the speedy trial requirements set forth in Florida Rule of Criminal Procedure 3.191; (3) ineffective assistance of counsel for failing to adequately investigate and present Whitfield's case at the penalty phase by not discovering and presenting additional witnesses; (4) ineffective assistance of counsel at the penalty phase for failing to request a jury instruction pursuant to Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); (5) ineffective assistance at the penalty phase for failing to object to the prosecution's presentation of nonstatutory aggravators in the form of statements to the jury that Whitfield's prior crimes all involved female victims and were committed in the presence of children; and (6) violations of Whitfield's rights under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), by failing to obtain an adequate mental health examination and failing to provide necessary information to the mental health expert.

II. ANALYSIS
Whitfield presents six issues on appeal. We discuss at length only the first three. As to issues four and five, we summarily affirm because Whitfield presents merely conclusory arguments. See Cooper v. State, 856 So.2d 969, 977 n. 7 (Fla.2003) (rejecting the argument that the "lower court erred in its summary denial of these claims," and finding such "speculative, unsupported argument of this type to be improper"); see also Randolph v. State, 853 So.2d 1051, 1063 n. 12 (Fla.2003) ("[T]he purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues.") (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990)); LeCroy v. Dugger, 727 So.2d 236, 240 (Fla.1998) (upholding the summary denial of a postconviction motion because the defense alleged no facts to *379 substantiate its conclusory claims of ineffective assistance of counsel). As to issue six, we also affirm because, insofar as it states a proper Ake claim, it should have been raised on direct appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla. 2003) (holding an Ake claim contained within an ineffective assistance of counsel claim "procedurally barred because it could have been raised on direct appeal"); Moore v. State, 820 So.2d 199, 203 n. 4 (finding Ake claim procedurally barred because it could have been raised on direct appeal); Cherry v. State, 781 So.2d 1040, 1047 (Fla.2000) ("[T]he claim of incompetent mental health evaluation is procedurally barred for failure to raise it on direct appeal."). Insofar as it alleges ineffective assistance of counsel for failing to pursue an Ake claim, Whitfield has failed to show either deficient performance or prejudice.
We discuss below Whitfield's arguments on issues one through three, all of which assert, on different theories, that trial counsel provided ineffective assistance. Ineffective assistance of counsel claims are judged under the following standard:
An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness."
Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted) (quoting Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The prejudice prong of the analysis "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687, 104 S.Ct. 2052. Accordingly, in order to succeed on his claims, Whitfield must establish both deficient performance and prejudice.
We begin by examining Whitfield's claim that trial counsel were ineffective for failing to properly present his defense of voluntary intoxication. Next we consider Whitfield's claim that counsel were ineffective for proceeding with speedy trial. Finally, we consider Whitfield's claim that counsel should have called additional witnesses at the penalty phase.

A. Voluntary Intoxication
Whitfield first claims that trial counsel were ineffective for failing to adequately present a voluntary intoxication defense to first-degree murder, burglary, and armed sexual battery. The defense of voluntary intoxication is only valid for specific intent crimes such as first-degree murder and armed burglary. See Straitwell v. State, 834 So.2d 918, 920 (Fla. 2d DCA 2003) (noting that "[v]oluntary intoxication is a defense to specific intent crimes such as burglary and petit theft"); Carter v. State, 801 So.2d 113, 114 (Fla. 2d DCA 2001) (recognizing voluntary intoxication as a defense to specific intent crimes). The defense is not available for general intent crimes. See Straitwell, 834 So.2d at 920 ("[Voluntary intoxication] is not a defense to general intent crimes such as sexual battery."); Bland v. State, 563 So.2d 794, 795 (Fla. 1st DCA 1990) (recognizing attempted sexual battery as a general intent crime for which the defense of voluntary intoxication is not available). Therefore, the circuit court properly rejected Whitfield's claim of ineffective assistance of counsel for failing to properly present the defense of voluntary intoxication for the crime of sexual battery with a deadly weapon. We address only the claim as it relates to Whitfield's convictions *380 for armed burglary and first-degree murder.
Whitfield argues that trial counsel were ineffective for failing to call four witnesses: Dinah Giles, Harriet Miller, Evelyn Ford, and Peggy LaRue. These witnesses, Whitfield argues, should have been called to corroborate the voluntary intoxication defense. From their testimony at the evidentiary hearing, these witnesses apparently would have testified about Whitfield's history of drug use as well as his impoverished background. Whitfield fails to establish either deficient performance or prejudice, however, as to any of these witnesses.
In denying Whitfield relief on this issue, the circuit court found as follows:
[T]he Court finds that at trial, substantial evidence was presented concerning Whitfield's use of cocaine. The defense accomplished this through the testimony of lay witnesses and Dr. Regnier. Any additional testimony set forth by any of the witnesses, who testified at the evidentiary hearing[,] would have been cumulative.
We have affirmed denials of relief in similar circumstances. In Cole v. State, 841 So.2d 409 (Fla.2003), for example, the defendant argued that defense counsel was ineffective for failing to call certain witnesses to corroborate his drug abuse problems. Id. at 414 n. 3. The circuit court rejected the claim without an evidentiary hearing because, in its opinion, defense counsel had introduced sufficient evidence of Cole's drug use so that "[a]ny additional evidence of drug and alcohol use would have been cumulative of that actually presented." Id. at 425. Cole's trial attorneys, like Whitfield's, had produced evidence of Cole's drug abuse through lay witnesses and an expert witness. We affirmed:
We find no error in the trial court's conclusion that Cole was not entitled to an evidentiary hearing to present what the trial court found would have been cumulative evidence. See Valle v. State, 705 So.2d 1331, 1334-35 (Fla.1997) (affirming trial court's summary denial of ineffective assistance claim based on allegation that trial counsel failed to present cumulative evidence).
Id.
We also faced a similar situation in Marquard v. State, 850 So.2d 417 (Fla.2002). Marquard claimed ineffective assistance of counsel for failing to call witnesses to testify as to his drug problems and abuse suffered as a child. Id. at 429. Defense counsel had introduced this information solely through their expert witness. Id. We agreed with the circuit court's denial of the claim:
Although other witnesses could have provided more details relative to Marquard's early life, counsel is not required to present cumulative evidence. Accordingly, we do not find that Marquard's counsel was ineffective in his representation.
Id. at 429-30 (citing Maharaj v. State, 778 So.2d 944, 957 (Fla.2000) ("Failure to present cumulative evidence is not ineffective assistance of counsel.")).
According to our precedents, therefore, trial counsel have significant leeway in determining how to present such evidence. In Whitfield's case, defense counsel presented significant evidence of Whitfield's drug use problems through several witnesses, including their expert witness, Dr. Regnier, police officers, and lay witness Estella Brooks Pierre. Pierre had been in a relationship with Whitfield in 1995 and for a period the two cohabited. She testified at trial that Whitfield had a drug problem and that she had spoken with him at the time about getting help, but that he *381 never sought rehabilitation. She noted that when he would get paid at work he would disappear for days at a time and that his eyes would enlarge when he was under the influence of drugs. She also testified that after he was shot, the drug problem worsened.
Dr. Regnier testified concerning Whitfield's long history of drug use, including his Baker Act hospitalization. He also testified that he had consulted with family members and acquaintances who described Whitfield's drug use as well as his demeanor while under the influence. Dr. Regnier believed that Whitfield's paranoid disposition was the result of his cocaine use. Finally, Dr. Regnier concluded that he believed Whitfield "was under a lot of cocaine" on the day of the murder.
Defense counsel questioned a police officer on cross-examination about Whitfield's words and actions when he was arrested. The officer testified that Whitfield told him that he had smoked as much as $500 worth of crack cocaine on the eve of the crime. Another officer testified that Whitfield told him upon his arrest that he had "smoked a large amount of cocaine the night before."
Having presented this testimony, trial counsel made a strategic decision not to call additional witnesses. Counsel cannot be held ineffective for these strategic decisions: "Strategic decisions do not constitute ineffective assistance if alternative courses of action have been considered and rejected." Rutherford v. State, 727 So.2d 216, 223 (Fla.1998) (quoting State v. Bolender, 503 So.2d 1247, 1250 (Fla.1987)).
Whitfield argues that trial counsel nevertheless should have presented the testimony of Dinah Giles, Harriet Miller, Evelyn Ford, and Peggy LaRue. But trial counsel either considered and rejected calling these witnesses or could not have known about them. Moreover, their testimony would have been cumulative to what was presented.
As to Giles, trial counsel Williams, now Judge Williams, testified at the evidentiary hearing that he knew who Giles was, interviewed her, had her interviewed by his expert Dr. Regnier, and made a conscious choice not to call her to the stand. Ms. Syprett,[3] co-counsel along with Judge Williams, testified as follows regarding the decision not to present Giles or Whitfield's mother:
[T]hey were not good historians, they were inarticulate, and the real problem with them was that they were, what I call malleable. I mean they would say one thing but it would have been very easy for a prosecutor to take what they have said and have them unsay it in the cross-examination. So we did not feel confident or comfortable in relying upon them as our star witnesses in the guilt phase.
The other thing is, you know, we know the jury pools that we get in Sarasota County, and they were not what I would call sympathetic witnesses, they would not have helped Mr. Whitfield. They were well intentioned, they wanted to help Mr. Whitfield, but I believedwe believed that Dr. Regnier could present the exact same information in a much more articulate, convincing, firmer manner that would hopefully persuade the jury.
Trial counsel clearly considered alternative means of proceeding and in their professional judgment decided not to call Giles to the stand.
As to Harriet Miller, Judge Williams testified at the evidentiary hearing that he knew of Miller and decided not to call her *382 as a witness because of Whitfield's prior conviction for a violent crime against her. Trial counsel considered the possibility of calling Miller but decided that the potential negative impact of Miller as a witness outweighed any useful testimony she might provide. Furthermore, Miller's testimony would have provided the prosecution a potential opportunity to explore Whitfield's violent tendencies. See Medina v. State, 573 So.2d 293, 298 (Fla.1990) (finding no ineffective assistance of counsel where proposed testimony would have revealed information that "would have shown [defendant's] violent tendencies").
As to Evelyn Ford, Judge Williams could not recall ever hearing her name from Whitfield. The circuit court found that "Whitfield did not provide this name to his defense attorneys, and further he has failed to demonstrate any prejudice in his attorneys' failure to call her as a witness." As is the case with Giles's testimony, Ford's testimony would have been cumulative. Furthermore, Ford's testimony, like Miller's, would have had the further liability of opening up for exploration Whitfield's violent tendencies. See id.[4]
Finally, as to Peggy LaRue, she did testify at Whitfield's trialas a State witness. Among other things, she testified that when she encountered Whitfield on the morning after the murder, he appeared to have big eyes, was talking fast, and looked nervous. She stated that she believed that Whitfield was under the influence of cocaine that morning. LaRue's testimony at the evidentiary hearing added nothing new. Her testimony also would have been cumulative.
Trial counsel made a conscious decision to use Dr. Regnier as their main witness. He was used as a medical expert and also to introduce Whitfield's family medical history and his background into the record. When asked at the evidentiary hearing why they chose Dr. Regnier, Syprett responded that it was a judgment call based on their interviews with the potential witnesses. When asked a similar question, Judge Williams responded as follows:
A: For a variety of reasons. Number one, I think Dr. Regnier is an excellent psychologist. He has an excellent rapport I think with jurors. Jurors tend to like him. Also, there were issues in terms of the defendant's personalty (sic) that I felt Dr. Regnier would be better able to handle than another psychologist.
Q: And through Dr. Regnier you were able to in essence, able to get in all of his family background?
A: Yes.
Q: All of his history?
A: Yes.
Q: All the interviews with family members and other persons involved in his life?
A: Yes.
With the testimony of Dr. Regnier, trial counsel obtained a voluntary intoxication jury instruction. According to the circuit court, "the record reveals that the defense requested, and the court gave the voluntary intoxication jury instruction at trial as a defense to first-degree murder and armed burglary." See also Whitfield, 706 So.2d at 2 (stating that Whitfield's defense was based on voluntary intoxication). The circuit court concluded: "Because the voluntary intoxication defense was investigated, presented, and considered by the jury at trial, Whitfield is not entitled to relief." Whitfield has failed to show either prejudice *383 or deficient performance in trial counsel's failure to call additional witnesses.
Whitfield also claims under this issue that trial counsel were ineffective for failing to hire a toxicology expert. As with the failure to present additional witnesses, Whitfield fails to establish prejudice or deficient performance. At the evidentiary hearing, Whitfield presented the testimony of Dr. Mash, an expert in the field of toxicology and the effects of crack cocaine drug abuse on the brain. She testified as to the effects on cognitive function of long-term crack cocaine abuse and commented that a severe addict would have difficulty distinguishing right from wrong. She also testified regarding urine and hair analyses that could have been performed on Whitfield that would have indicated whether he had in fact taken crack cocaine. However, Dr. Mash did not indicate that she would be able to determine Whitfield's exact level of crack cocaine exposure at the time of the murder. Specifically, she stated that had a urine sample been taken on June 21, 1995,[5] two days after the crime, the markers in the urine "would be consistent with an individual who had used cocaine, and then depending on the amounts that were in the urine, will give you, again, some indication of the level of use. It's not absolute, as it has been pointed out, as blood is the ultimate measure."[6] Further, Dr. Mash opined that Whitfield is a "very severe crack-cocaine addict" and that "[h]is level of dependency on crack-cocaine was very severe and he was dysfunctional, I believe, due to his severe use of crack cocaine."
Syprett testified at the evidentiary hearing that after her initial meeting with Whitfield she contacted two different labs about the possibility of determining his level of intoxication at the time of the murder. Syprett specifically recalled speaking with a toxicologist about this possibility and was told "it's nonsensical what you are trying to do." At a pretrial conference, Syprett stated on the record that upon Whitfield's request that they take a urine sample for analysis to determine his level of intoxication at the time of the murder, she "spoke to not one but definitely two and possibly three local authorities" about the possibility of taking urine samples for this purpose and "was advised that it wouldn't show what [Whitfield] wanted us to show." Syprett stated that based on the information she received, she and co-counsel decided "that it was not going to serve any useful purpose" to take a urine sample and have it tested.
In denying Whitfield's claim below, the circuit court stated:
While Whitfield's postconviction motion alleged that Mash would provide testimony concerning additional mitigating evidence not presented during the penalty phase, the Court finds that she did not specifically identify any statutory or nonstatutory mitigators that could have been set forth but were not. Judge Rapkin further made the following findings concerning Whitfield's substance abuse in the final sentencing order:
"I believe that the defendant is a cocaine addict, and that he probably did use cocaine some time shortly before the murder."
"The defendant suffered from chronic crack cocaine addiction."
*384 Dr. Mash's testimony does not establish that trial counsel were ineffective. Trial counsel made a reasonable choice based on available information not to obtain a toxicology expert. Further, Dr. Mash's testimony does not indicate that, had a urine sample been taken, an accurate reading of the level of cocaine in Whitfield's body at the time of the murder would have been established. Her testimony merely confirms what Dr. Regnier's testimony, along with other lay witnesses and police testimony, established at trialthat at the time of the murder Whitfield was under the influence of crack cocaine. The trial court recognized this in its sentencing order. Whitfield cannot establish deficient performance or prejudice on this issue.

B. Speedy Trial
Against the advice of his trial lawyers, Whitfield emphatically, unequivocally, and repeatedly demanded a speedy trial.[7] Now he claims that trial counsel were ineffective as a result. He argues that making a demand for speedy trial under Florida Rule of Criminal Procedure 3.191 is a strategic decision within the province of counsel's discretion. Because we determine that no prejudice resulted from the speedy trial demand, we need not consider whether counsel provided deficient performance by acquiescing in Whitfield's desire to request speedy trial. See Orme v. State, 896 So.2d 725, 736 n. 2 (Fla.2005) (declining to reach prejudice prong where no deficient performance found); Sweet v. State, 810 So.2d 854, 863-64 (Fla.2002) (declining to reach the question of deficient performance where the Court determined that no prejudice existed); Stewart v. State, 801 So.2d 59, 65 (Fla.2001) ("[B]ecause the Strickland standard requires establishment of both [deficient performance and prejudice] prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong.").
The time constraints placed on the defense team because of the speedy trial timeline did not prejudice Whitfield's defense. It is true that Dr. Regnier testified at trial that he was unable to form an ultimate opinion as to voluntary intoxication because he had insufficient data. However, at the evidentiary hearing below he testified that the reason for his inability was not the speedy trial demand but Whitfield's deliberate refusal to cooperate.[8] Despite these difficulties and the time constraints of speedy trial, the defense team, as noted earlier, obtained a voluntary intoxication jury instruction. Furthermore, the trial court noted in its final sentencing *385 order that it believed Whitfield was a severe crack cocaine addict and was under the influence on the morning of the murder.
Despite his behavior at trial, Whitfield has cooperated with his current defense team. However, other than one additional witness, Freddy Lewis Stanley Atkins (discussed below), who could have offered only cumulative evidence of Whitfield's background, the current defense team has based their case on essentially the same information presented at trial. Whitfield has presented two new experts who testified that, in their opinion, Whitfield was incompetent to make strategic decisions and that Dr. Regnier's examination of Whitfield was insufficient. But an ineffective assistance of counsel claim cannot be based on a defendant's procurement of new experts with different opinions. See Phillips v. State, 894 So.2d 28, 39 (Fla. 2004) ("The fact that [defendant] now has new experts does not indicate that his counsel was ineffective, where counsel did investigate and present evidence on the[] issues."). Whitfield does not present any significant new evidence that would have been discovered and presented had speedy trial not been demanded. Whitfield cannot establish prejudice on these facts.

C. Additional Witnesses
In his third issue, Whitfield argues that trial counsel were ineffective for failing to call additional witnesses to corroborate evidence of Whitfield's background. Whitfield claims that counsel should have discovered Freddy Lewis Stanley Atkins and called him to testify about Whitfield's family history. Atkins is an important community leader and politician in Sarasota. Early in his career he worked for a family counseling program called Storefront. While there, Atkins was assigned to counsel Whitfield's family. Whitfield claims that trial counsel should have discovered Atkins and called him to corroborate evidence about Whitfield's family history.
However, Whitfield never mentioned Atkins's name to his trial lawyers. Neither did his family. Judge Williams testified at the evidentiary hearing that he recognized Atkins's name but that it was never mentioned by Whitfield, his family, or the investigator on the case. He further testified that it was very difficult to obtain information from Whitfield and that he "received very little support in terms of [Whitfield's family] getting information." Syprett testified that Whitfield never mentioned Atkins's name and that she was "surprised when [she] saw [Atkins] sitting in the hall" at the evidentiary hearing.
Even assuming trial counsel should have found and presented Atkins, Whitfield cannot demonstrate prejudice. Despite Whitfield's lack of cooperation, the defense managed to elicit through their expert significant facts about Whitfield's background. Dr. Regnier testified that Whitfield "suffered from a polydrug dependence that was chronic of long term, spanning some nine years," and that Whitfield also suffered from posttraumatic stress because of his gunshot wound.[9] Dr. Regnier also testified that Whitfield additionally was "suffering from a major depression also of long standing." This depression was "manifested by a series of suicidal ideation and one serious attempt." Regnier also noted Whitfield's Baker Act commitment. Because of these facts, his review of the record, and his interviews with Whitfield's family, Dr. Regnier opined that at the time of the murder Whitfield was suffering from extreme *386 mental or emotional disturbance, a statutory mitigator.
At trial, Dr. Regnier testified at length about Whitfield's childhood and upbringing. Dr. Regnier began his testimony on Whitfield's childhood:
[T]his world I'm about to describe is not one that we easily see and it's very difficult for me to describe, even though I have a lot of firsthand knowledge of it.
It is not a world that one wants to remember and America doesn't like to remember . . . . We like to keep it hidden and so do I. Any of us who gets out of this world wants to forget it.
It is a world where nothing is permanent. It is a world of fear. It is a world of hunger. It is a world of psychological and spiritual hunger. It is a world of isolation and loneliness. It is a world of parents, the adults in our world are dysfunctional. They don't nurture. They don't feed.
In fact, they do the opposite. They hurt. They inflict physical, emotional and spiritual harm in children.
Q: Did you discover this in Mr. Whitfield's early childhood?
A: This is exactly the world he comes from.
Q: And was that at the hands of his father or his mother?
A: This is at the hands of every adult in his life. It's not just the mother or the father. It's every adult that this young man comes in contact with as a child.
His father never accepted him as a son.
Dr. Regnier proceeded to describe a very difficult childhood where Whitfield's father repeatedly beat him and his mother. He described Whitfield's earliest memory as one of "his father holding a gun after beating his mother to a bloody pulp, holding a gun to her head and threatening to shoot her, and Ernest [Whitfield]." Dr. Regnier also described Whitfield's impoverished surroundings, how the children in the family sometimes went hungry, and how Whitfield was hospitalized as a child because of an infection caused by worms.
Whitfield cannot establish prejudice. Any testimony Atkins could have provided in Whitfield's defense would have been cumulative to that provided by Dr. Regnier. As discussed above, trial counsel are not ineffective for failing to present cumulative evidence. See Marquard, 850 So.2d at 429-30 ("[C]ounsel is not required to present cumulative evidence."). Furthermore, Atkins's testimony would only have added to the nonstatutory mitigating circumstance of Whitfield's impoverished background. The sentencing court found no statutory mitigators but considered the following nonstatutory mitigating circumstances:
[C]ooperation with authorities (little or no weight); impoverished background (considerable weight); crack cocaine addiction (substantial weight); Whitfield's abandonment by his father and his mother's alcoholism (some weight); and that Whitfield was the victim of a near fatal shooting but forgave his assailant (little or no weight).
Whitfield, 706 So.2d at 3. The court, therefore, considered all of the nonstatutory mitigation that could have been provided by the additional witnesses. In light of the three strong aggravators in this case, "prior violent felonies (two prior aggravated batteries and contemporaneous sexual battery of another victim in this case); commission in the course of a burglary; and that the murder was heinous, atrocious, or cruel," the sentence would not have been different had the sentencing court given more weight to the nonstatutory mitigators. Id.
*387 Whitfield also claims that trial counsel should have called Whitfield's mother, Leola Rich. As previously discussed, trial counsel had strategic reasons for not calling Whitfield's family members to the stand. According to counsel's judgment, Rich would not have made a good witness because she was, among other things, "inarticulate" and a poor historian. Furthermore, Rich appeared at Whitfield's trial in a state of visible intoxication. Counsel had good strategic reasons for not calling Rich to testify. There was no deficient performance or prejudice because of counsel's failure to call Rich to the stand.
Whitfield also claims that trial counsel should have discovered and presented William Peterson as a witness at the penalty phase. Peterson was Whitfield's employer at the time of the murder. Peterson testified at the evidentiary hearing that Whitfield was a good worker who never had any disciplinary problems, was always on time or early for work, and never missed work. Trial counsel could not recall if Peterson had been specifically mentioned in the investigation but he did recall that he had discussed Whitfield's employment history with the investigator and with other persons who had knowledge and had specifically chosen not to call any witnesses on this issue. Peterson's testimony could have been relevant as nonstatutory mitigation. However, such testimony would be inconsistent with the defense's theory that Whitfield was a severe crack cocaine addict and would disappear for days at a time. Defense counsel made a reasonable strategic decision not to present evidence of Whitfield's employment history. Furthermore, counsel's failure to present the testimony of Peterson does not undermine our confidence in the outcome of this case considering the strong aggravating factors found by the trial court. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

III. Conclusion
For the reasons explained above, we affirm the trial court's denial of Whitfield's postconviction motion.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The facts are taken from Whitfield's direct appeal. See Whitfield, 706 So.2d at 2-3.
[2] These were: (1) error in removing Whitfield from the courtroom during jury selection; (2) erroneous admission of testimony regarding the incident at Reynolds's house several weeks before the crime, in which Whitfield threatened the victims; (3) improper comments by the prosecutor and introduction of irrelevant evidence; (4) the judge's erroneous response to a jury question about the meaning of life imprisonment without the possibility of parole; and (5) failure to find certain mitigating factors and erroneous evaluation of the aggravating factors.
[3] At the time of Whitfield's trial, Ms. Syprett's last name was Scott.
[4] Ford testified that when under the influence of drugs, Whitfield had broken a window in his mother's home and punched his stepfather.
[5] This is the date when Judge Williams was appointed to represent Whitfield. Obviously, neither Williams nor Syprett could have obtained samples before then.
[6] According to Dr. Mash, to obtain a meaningful measure, a blood test needed to be performed within forty-five to ninety minutes after Whitfield ingested the cocaine.
[7] Whitfield made these demands on several occasions in open court. In one pretrial hearing Whitfield personally demanded speedy trial at least five times, stating: "It's also in my best interest I would like to exercise my rights, and my rights are asking you to grant me a speedy trial."; "So I'm asking you to grant me that motion for a speedy trial. I'm exercising my rights . . . I am open and willing to sign anything for me to have a speedy trial . . . I want a speedy trial."; "But II want to exercise my right, and that is my right, constitutional right tofor a speedy trial."; "I want a formal speedy trial. That's my right. That is my constitutional right . . . I do not want to delay this . . . because a lot of people will get hurt, a lot of things will come out, all right, and I would like to protect a lot of people."; "That's what I had notarized to get this speedy trial in process, right."
[8] Dr. Regnier testified that regarding his psychological tests on Whitfield, "had he cooperated, time would not have been an issue." Further evidentiary hearing testimony established that Whitfield admitted to Dr. Regnier that he hoped that neither his attorneys nor the prosecution would be ready for trial because of his speedy trial demand. He also told Dr. Regnier that he hoped this situation would bring about a mistrial or provide him with many grounds for appeal.
[9] Dr. Regnier testified that Whitfield had flashbacks and was extremely paranoid that his assailants were going to find him and shoot him again.